Security Walls, LLC v. National Labor Relations Board, No. 22-11339. You may come up to the podium, Mr. Jones. I see that you have reserved three minutes for rebuttal. And Mr. Cantor, is everything okay on your end by Zoom? Yes, Your Honor. Okay. Thank you. Mr. Jones, you may proceed. Thank you, Judge. May it please, I'm Milton Jones on behalf of the petitioner. The issue before the court today that we bring is concerted activity, protected activity when it requests changes inconsistent with the existing collective bargaining agreement and without union approval. Mr. Jones, could you tell this court what grounds did you argue before the board below on the issue of concertedness? Because if not, it should be deemed waive. What grounds were argued before the board below on the issue of concertedness? I didn't see that there were any arguments made before the board on the ground of concertedness. The arguments we were made before? Yes. The board? Yes. On the concerted action issue, on what you, the argument you just raised. That is the only issue that we are bringing before the board. No, was it raised below? Yes, Your Honor. It was under 9C. Can you show it? Because to my understanding, it was not raised below. Your Honor, I believe that that was the gravamen of what we took before the NLRB is that Kelly, the employee, was terminated. He says it was because of concerted protected activity. We said to the ALJ that it was concerted, but it wasn't protected. And that's what we, and the ALJ ruled against us. And then we brought the same issue before the NLRB, that it was concerted, but it was not protected. Well, look, I read a number of case laws cited by the board, and it tends to me that you are relying strictly mostly on the Emporium case, which appears to be an outlier and totally different from what Mr. Kelly's actions were. So how do you just disregard those other cases that were cited by the board that Mr. Kelly's action was even less than what those other cases stood for? So how does the Emporium case that you cite relate to this matter? We do incite the Emporium case, Your Honor, is that we show that under 9C, I mean 9A, we show under 9A that it's like two boxcars, Judge, is that the boxcars are hooked up. One says concerted activity, the other says protected activity, is that whenever we see them, they're always together. It's like the peanut butter and sugar relations. But we say that 9A limits the activity. It says it can be concerted, but it's no longer protected because of what the employee does. So I agree with you that 9A is a limitation on the right in Section 7. I think that's a fair reading, and I think that's how you have to read the Supreme Court cases. Yes. So I have a couple questions, though, about that for the purpose of collective bargaining. You agree? In other words, at the beginning of 9A, that first sentence says is the majority representative of the union is the exclusive representative for the purpose of collective bargaining. Yes. Meaning when you join a union, you suppress your minority view on behalf of the majority who speaks for the union, right? Yes. Okay. My question here is, how was what the employee, the security guard, how was what he did here collective bargaining or done for the purpose of collective bargaining? Well, the courts take a fact-intensive approach when determining whether the that's when they were talking about things that were inconsistent with the union's right of exclusive representation. We're going to get there, but counsel, what I want to ask is how is what he did here? So as I understand it, he complained that he wasn't getting reimbursement when he went for his training cause. He complained because the supervisor was treating him poorly. He complained that he was taken from a roaming post to a, or from a stationary post to a roaming post. He complained about the switch in hours because they were going to go to a 12-hour day instead of an eight-hour day. He had a lot of complaints. Yes. So my question is, how are those for the purpose of collective bargaining as that term is used in the statute? Your Honor, is that I believe that when we go and talk about the cases that are relevant to this and part of this, they talk about the union being the exclusive bargaining agent and anything else would be balkanization. And I agree. You and I are on the same page, but it's for collective bargaining. What is collective bargaining? Because not every gripe, they put Pepsi rather than Coke in the soda machine, is not collective bargaining, right? Yes, Your Honor. Okay. So what is collective bargaining? Collective bargaining is the agreement and negotiations between the unit and the employer for their mutual aid protection. By the way, that's almost a textbook definition as I understand it. So I looked it up in Black's Law and you know, back in law school, you go to Black's Law. I opened it up and it gave me this definition. It said, collective bargaining is negotiations between an employer and a representative, the union, to determine the conditions of employment like wages, hours, discipline, and fringe benefits. That's right. How is what the employee did here, A, a negotiation and B, a discussion or whatever to determine the conditions of employment as opposed to a general gripe about you're not complying with what you said you were going to comply to? It went beyond that. In other words, the cases are clear that if the employee is simply trying to enforce aspects and provisions of the collective bargaining agreement, I think he's good to go. Okay. So we're on the same page there. Show me what was in the nature of collective bargaining as opposed to him saying, you and I agree to this contract, live up to your potential. I've looked at, I've read the entire collective bargaining agreement. Tell me what any of the complaints that he did is inconsistent with the rights in the collective bargaining agreement. Yes, your honor, is that Kelly talked about things such as working conditions. He talked about wages. He talked about shift differential and he wanted to change. Yes, sir. Sorry, I apologize for interrupting, but there were specifics that it wasn't just wages. It was, so I'll break it down. So the first thing was supervisor, right? He wanted his supervisor, he was upset his supervisor yelled at him and cursed at him and did things to him, right? Yes. Okay. The collective bargaining agreement, and I'm looking at section 5.2 or 5.1, I'm sorry, states, it is therefore essential and expected by the company and union that all employees shall be in a, or shall act in a highly professional, courteous manner. Isn't that complaint that his supervisor was treating him discourteously and unprofessionally consistent with, as opposed to inconsistent with the collective bargaining agreement? Yes, your honor, but that's really not the reason why he got fired and that's really not the gravamen of what we're talking about. Okay. May I tell you? Yeah, please. Right. Is that, for example, Kelly sent an email to Mrs. Walls and he says in his email, he says, I understand the process a union plays in regards to issues in the workplace, but these issues run much deeper than an entry level grievance can handle. He says, I know I have a contract. I know I have a grievance procedure, but I don't want to use that. Did he make any demands or threats if the company did not apply with his concerns? Do you make any demands? Or threats, yes. In other words, in other words, do this or else? We're going to pick it. We're going to strike. We're going to, any of that. Did he make any demands or threat by voicing his concerns to management if you don't comply? It was an or else. And what are we supposed to make of the fact and the board points out that the record shows that the union stood with Kelly and filed a grievance on his behalf. Doesn't that cut against your argument that the actions he was taking towards his employer were in any way inconsistent with the collective bargaining agreement? Well, they filed, he filed the grievance after the suspension. Up until that point, all of his actions were against and saying, I'm not going to use the union. When he went in and tried to change the shift differential, he didn't use the union specifically. When he went in and tried to change the wage structure, he didn't use the union specifically. I understand that. And certainly he did not follow, at least in every instance, the grievance procedure outlined in the collective bargaining agreement. But the key is, as you pointed out earlier, which is, were his complaints, were the things he was complaining about inconsistent with the collective bargaining agreement? And so let's take the hours, for example. Section 9.3 of the collective bargaining agreement says full-time hours are defined as 36. I'm sorry. I'm looking at section 6.3. To the extent possible, all work schedules shall be performed in a manner that provides the employees with two consecutive days off for every five working days, meaning you're only going to work five days, not three days in a row. And secondly, employees shall work an eight-hour shift with an additional 15 minutes to gun up and post for a total of 8.5. He was asking, when they were looking to change to a 12-hour day, to comply with section 6.3, was he not? Yes, but is that also he was asking for not just compliance, he was asking for change. He says that I want change, and of course his co-adjutant Rahm Emanuel says that the only way you can get something done is by going to management. You don't go to the union. When he filed his grievance, all of this stuff that we're talking about happened before that. And the reason why the ALJ and the board said this was concerted protected activity because of the firing, because of the suspension, whereas if the action before it became uncoupled and there was no protected activity, then the firing and the suspension, there are no animosities. But do you agree that there was animosity between him and Robinson? Him and Robinson, clearly there was a type of animosity towards him. And I read where Robinson stated that he himself was suspended 30 days, but yet you all subpoenaed records, and there was nothing to document that Robinson himself was in fact suspended. Do you recall that? I do recall that, and I'm trying to remember. I remember that the records were there that Robinson got suspended for. It's for proof of the suspension, and somehow no one can find any documentation that Robinson was in fact suspended. And I think even the board had issues with his credibility. Is that correct? You know, Your Honor, is that as I remember it, is that the suspension for Robinson was produced and Robinson testified that he got suspended for the wrongful actions. Mr. Jones, I know your time is up, but I do have one final question just to go back to one of the questions that Judge Luck had asked. Can you point to a section of the collective bargaining agreement where you are arguing that Mr. Kelly's actions were inconsistent with it? Is there a particular section that you can point to? Your Honor, I can point to several. All right. For example, the section one, management rights. Management can assign employees to whatever job positions that we want to assign them. He wanted to, Kelly, wanted us to come back and say he wanted to have this other position that he wanted. There's sections. Your Honor, I don't have those right off the top of my head, but I can say wages and shift differential. I think it was right around 8.1. And in those, he says that he wants to change it because I don't, I don't like the shift differential. You're paying these people too much. I want you to change it. And so these things such as wages, shift differential, management rights on position assignments, and other working conditions. All right. Thank you. Thank you, Judge. You will have three minutes for rebuttal. Mr. Cantor. Yes, Your Honor. Your Honor, may it please the court. Jared Cantor on behalf of the National Labor Relations Board. I want to address the central issue in this case, but I want to first emphasize as Judge Smith has that it is only the central issue because it's undisputed that Kelly's activities were concerted. It's undisputed that the company had knowledge of them. And as detailed in our brief, the company has essentially forfeit any challenge to the board's multiple findings that the adverse actions in this case were unlawfully motivated. Now, as to the central issue in this case, Kelly engaged in classic protected concerted activity. He raised shared employee concerns about workplace issues, and he did so without running afoul of Emporium Catwell, which is the basis of the company's argument. And the reason he doesn't run afoul of... But counsel, this seems to me a little bit the point. I agree with you. This is clearly within the scope of Section 7 and 8. But the question really is about Section 9a and its interaction with those. And I have to say I agree with your opposing counsel here that carved out from the larger right of Section 7 is the limitation in Section 9a. And so really the only question for us, in my mind, is determining whether the first sentence or the first part of Section 9a applies. And if it does apply, then I think that it's carved out from Section 7. And if it doesn't apply, then I think the board was right in its conclusions regarding Section 7 and 8. Yes, Your Honor, I think that really is the issue here. And we look to essentially the North Star case here, Emporium Catwell. And again, interestingly, out of all the cases cited by the parties or that the company has cited, other than Emporium Catwell and Tanner Motor, we have a panoply of cases with employees doing, as Judge Smith pointed out, more significant actions than Mr. Kelly did. And yet all those employees did not lose their As the board pointed out in sort of looking at the facts of Emporium Catwell, Kelly here did not act against union instructions. He didn't take in positions contrary to the bargaining agreement. He didn't try to derogate the union's authority. And he didn't resort to any economic coercion to pressure the employer to bargain with him. He essentially was— What about what your opposing counsel says regarding the management? So there is a part where that the employee here was upset about his reassignment to a particular post and complained about that reassignment here. That would seem to be contrary to management's ability to assign staff to the places that they're needed for, is it not? Your Honor, his complaints about being restricted to a stationary post, um, that is not one of the bases of the protected concerted activity findings here. Is it not? I thought one of the incidents— There's an unfair labor practice finding that Robinson restricted him to a post. And then there are the animus findings that we lay out in the brief. But the judge and the board don't go into whether his— that that was a protected concerted activity because obviously, understandably, that would have been very personal to him. That's not one of his protected concerted activities. The protected concerted activities in this case that then underlie the unfair labor practices are his concerted complaints in February and March about the paychecks being incorrect. Your point is that the stationary post was the punishment for engaging in the protected activity, but the protected activity itself was not complaining about the post. Yes, Your Honor. The judge's decision, I believe, explicitly says that he's not getting into that. That's just an example of Robinson's acting out on his animus. Because again, essentially, I think if I look at here, we have four actions that the board found were the protected concerted activity. Again, the February and March paychecks— It's complaining about not getting the reimbursement. It's complaining about how he was treated by his supervisor, complaining about the— Complaining about the— Overtime. The overtime, and then complaining about the shift from the eight hour to 12 hours, right? Yes, but that's the initial one. The complaint wasn't just the reimbursements, it was the paychecks, that his and Lockwood's paychecks were undisputably incorrect. Can you show me where each of those were consistent with the collective bargaining agreement? Yes, Your Honor. As we note in our brief, the pay rates are set forth in the collective bargaining agreement, the hour rates, and the company certainly, as the CBA talks about, undisputed incorrect paychecks will be corrected, and the company immediately issued the extra money to remedy that problem. The overtime assignments in our brief, we point to the parts of the collective bargaining agreement, which show that when Robinson became the supervisor, he started at the bottom of the seniority list again instead of picking off, or instead of starting off where the prior supervisor had left. And when Kelly brought that to his attention, Robinson said, I'm just going to start over again. I'm not going to bother figuring out where the prior guy left off. As Your Honor points out, in terms of the protected concerted activity regarding Robinson's behavior, certainly the company points to nothing in the collective bargaining agreement saying supervisors can belittle and rage at employees. And as Your Honor pointed out, there's the provision in the agreement where you're supposed to treat each other civilly, essentially. And with regards to Mr. Kelly's final protected concerted activity near the end of his employment, he's raising that supervisory mistreatment behavior issue again. And as Your Honor points out and has been discussed, what Kelly was saying concertedly was, hold on, company. We hear this rumor you're about to switch to 12-hour shifts. We think that that's going to harm those of us on the day shift. And again, as Your Honor pointed out, the CBA, that would be the company changing the CBA. And that's a separate issue if they did that, whether that would have been an unlawful unilateral change. But that's not this case. It's just Kelly saying to them, hold on. This is the Washington Hospital case. Before you consider this action, we just want to let you know how we think it's going to adversely affect us. What about the fact that this is inconsistent with the grievance procedure? The way he went about complaining itself was inconsistent with how you go about doing so. And he said, if you want to get anything done here, you can't go through the union. You got to go directly to management. Well, I think his statement in that email to Walls, I think, is one, he's explaining why he's emailing her out of the blue, why a frontline employee is emailing the company president. So he's providing some context. He's sort of expressing his subjective frustration. And we certainly see that in the classic instance where you file a grievance and it gets processed, that happens here. When he's suspended and suspended and then discharged, maybe in the instant he says, you know, don't do it, he pleads, but he knows what he's supposed to do. You go to the union, you file a grievance, there's that formal process. But what the cases show us is that for the instances of the supervisor not following the overtime process, and you go up to them and sort of spontaneously complain, that that's not where you lose the protection of the act. That's not, certainly not what Emporium. But that's not what this is. I mean, this isn't a spontaneous complaint. This is a concerted choice, not concert, a specific choice by him and a knowing choice by him to forego the process in the collective bargaining agreement for a separate and independent process that cuts out the union. And so my question to you is, is that not inconsistent with and could be seen as collect collective bargaining? No, your honor. And I think partly for several reasons. First, the company hadn't changed the policy yet. There's nothing he would be grieving. And certainly the company's position is that if they were to go to 12-hour shifts, that that was entirely a management decision. So accepting their reasoning, the union would have had no role in that whatsoever. I know, but counsel, you could pick that one, you could pick any of the other protected activity, but all of those things, he did not go through the proper channels. He went through his own channels. And so the question again is, is him consistently doing that, showing his own independent collective bargaining of how he wants grievances to be handled as opposed to the procedure that's in the collective bargaining agreement? No, your honor. I mean, I think it's very clear that bringing concerted complaints, even in a unionized context, just raising those, just airing those concerted concerns does not cost you the act's protection. It's when you go a step beyond. And certainly as I think all the... You're saying that's true even where the collective bargaining agreement lays out an exclusive procedure by which to handle grievances? Yes, your honor. I mean, in all of these cases where there would have been unions, that's all the cases here, there are procedures to process grievances. And then 9A talks all about that. But the question just is, does an employee who does any of the things that he's done here, reach out to HR, talk to his supervisor, go up to the company president and air these concerns? You know, a grievance is usually about a very specific adverse action against the employee, like his suspensions, like his discharge, that then is essentially resolved through a grievance procedure. There's give and take, there's compromise, the company makes formal decisions. I mean, the company essentially listened to all of his grievance airing or complaint airing, and that was really, well, took adverse actions against them. But there was no bargaining about these things. As we point out in our brief, respectfully to the company, their opening brief, as we point out in ours, does not comply with FRAP. By essentially forgoing any discussion of the facts in the statement of the case, it lets the company not grapple with the board's fact-finding, which is supported by substantial evidence. The company essentially goes right to the argument part of their brief and says things like, Kelly wanted to bargain about wages. He said, you paid me the wrong amount. I mean, that's not bargaining about the wage rates. The company says he wanted to bargain about overtime. He was just pointing out to his super... Counsel, everything I've argued is within the fact findings of the NLRB. Everything that I've discussed with you is explicitly within those fact findings. So I understand you want to litigate, you're upset by the nature of the blue brief. They raise an argument, that legal argument's what we're talking about. I'm asking about fact findings of the NLRB. And my question to you is simply this, if four separate times you forgo the explicit and exclusive process for resolving the very things that you're supposed to resolve through union activity, separately by going directly to management, are you not then seen as negotiating or doing something separate and making a determination for how to resolve grievances that's different than the CBA? That's my question. No, Your Honor. No, I don't think there's any case that points to that, the essentially almost one-sided actions he's doing of airing of these workplace concerns, then you lose the act, the protection of the act. But Emporium is a bunch of employees who were unhappy with how race discrimination was being done through their grievance procedure. So what the union said is, hey, you guys belong to a union, you are alleging race discrimination, you have to go through the grievance process. And they said, no, we do not want to do that. We want to tell the president that we want to go directly to him and resolve these things with him. And my question to you is, why is this not similar to that? Well, Your Honor, because one, we don't have that key fact there of the union telling him to stop. We also don't have what I think then becomes the really dispositive facts in Emporium Capital. The employees then hold a press conference. They announce their intention to enforce their boycott. I mean, these are all the economic weapons that are reserved to unions. And then, in fact, the employees do go out and picket, they handbill, they urge customers not to patronize the store, and the union is telling them, stop. I mean, this is why in the panoply of these cases, there really are none of these. If the actions that Kelly took here are the kind that lose him the protection of the act, then employees have been losing the act for a very long time and in numerous numbers, because this is not the kind of activity that any of the cases indicate you lose your protection for. This is essentially very run-of-the-mill bringing of concerted concerns and just airing them, whether the company acts on them or not. To what extent should we look toward the response of the union to the activities of the employee? Should we care if the union is neutral about it? Should we care if the union opposes what the employee is doing? What role, how much should we factor that into the analysis? Your Honor, if I may answer your question? Yes. I see him over time. The Emporium Capital certainly emphasizes and points out the which my brother at the bar cites in their reply brief. Those cases point out that even if the activity was unauthorized or not approved by the union, that you then sometimes look if the union does any sort of, I wouldn't use the word ratifying actions, but usually what these cases point out is does the union still file grievances on behalf of the employee if they're punished? That's Noah's Ark processors. That's audio systems. In here, the union did. When he was discharged or suspended, suspended discharge, they file grievances on his behalf. So we certainly don't see any condemning of his behavior by the union. All right. Thank you. I see my time has expired. I'd ask the court to enforce the board's order in full, and I personally thank the court for allowing me to appear remotely today. Thank you. Yes. Mr. Jones. Thank you, Judge. We're talking about 9A. 9A really doesn't talk about whether or not the union is for it or against it. It says provided further that they have to take in the union when they go in for these negotiation sessions. But that's only if it's interpreted that, in fact, it was a negotiation session, right? Your Honor, I think you're absolutely right. And that's what Kelly put it as. He said these level one grievances, they're not enough to cover this. I want to talk to you about what's important to me about the wages, about the shift differential, about working conditions. That's what's incongruous to the existing collective bargaining agreement. So when you have somebody walking in and saying, I want to say something that's incongruous to the collective bargaining agreement, they can't do it. And also provided further, they can't do it without informing the union first. And Kelly knew. Union first, there was a mistake in his wages? Well, I think you're talking, I'm assuming you're talking about when he first started working and there wasn't a proper payment made. Correct. No, he didn't have to do that. He called Security Walls and he says that Security Walls took care of it the same day. There was no problem. What about the warning he received for missing work? How was that resolved? He could go in and fight. You see, Kelly knew all the time that he could file a grievance on all this. But each time that he was available to do that and he could do it, he said, no, I don't want to do that. I'm going to... Robert can tell him, I don't want you doing anything. You're going to be fired on the spot or suspended if you do these things or talking behind my back. Then you have like this supervisor punishing him. Say, if you do these things, this is what I'm going to do to you. There was a lot going on between Mr. Robinson and Mr. Kelly. And so all I can say is that in those things, Kelly said one thing, Robinson said another. That vouch, there wasn't any. Now, Kelly was suspended or terminated for allegedly moving from his post and there were other individuals in that 101 building that were not, did not receive the same ultimate sanctions as being terminated. Is that correct? Yes. And the reason why, I do remember that part. The reason why was because they were, that was part of their beat. That was part of their area that they were supposed to take care of. Kelly on the other side, what he was doing, he was supposed to be out in the field protecting the government facility. Instead of doing that, he was in the main area, which was not his beat. He was in the main area slurping down a Louisiana snow cone for 45 minutes. There is no doubt about that. He was not doing his job. I found otherwise that other, about the testimony that other officers were allowed to go into these different places as well, as it was tradition. Yes, Your Honor, I hear you. Thank you. Thank you both. We have your case under advisement and we are in recess until tomorrow morning. Thank you, judges. Thank you.